**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Jeffrey BROSH, Defendant–Appellant.**

**No. 09CA0342.**

Colorado Court of Appeals, Div. VI.

May 27, 2010.

Certiorari Dismissed Sept. 13, 2010.

John W. Suthers, Attorney General, Rhonda L. White, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

McClintock & McClintock, P.C., Theodore P. McClintock, Elizabeth A. McClintock, Colorado Springs, Colorado, for Defendant–Appellant.

Opinion by Judge LOEB.

Defendant, Jeffrey Brosh, appeals the district court's order designating him a sexually violent predator (SVP). We affirm.

### I.  Factual Background and Procedural History

Defendant was charged with multiple counts related to incidents during which he provided the twelve-year-old victim with alcohol and sexually assaulted him. The following facts are taken from the presentence report and associated documents and from the affidavit in support of the arrest warrant in this case.

Defendant was the victim's neighbor, and the crimes were discovered after the victim's father retrieved his son from defendant's house one evening. The victim had gone to defendant's house to watch movies with defendant's seven-year-old son and another friend. Defendant had asked if the victim could spend the night, but his parents said no and asked defendant to send the victim home. About an hour later, when his son had not returned home, the victim's father went to defendant's house and found the victim intoxicated. Defendant was also intoxicated. The victim told his father that defendant had given him alcohol. He also told his father that, two days before, defendant had given him alcohol and performed oral sex on him.

The victim's father took him to the hospital. At the hospital, the examining nurse discovered a "small tear" in the victim's rectum; the victim told her defendant had "put his finger in his rectum."

The victim also spoke with a police officer at the hospital. He told the officer that he had first gone to visit defendant's son two days before. When he got to the house, defendant was outside and told the victim there was a drink in the freezer inside the house. The victim said he knew the drink had alcohol in it but it tasted like cranberry juice. Inside the house, defendant's son was naked and chased the victim around. The victim said he got drunk enough that he dropped the glass and spilled the drink on his clothes, which defendant said he would wash. Defendant told the victim to take a shower and, while in the shower, defendant's son and defendant both got in with him. They went into defendant's room, and defendant told the victim to lie on the bed and then "put his mouth somewhere where [the victim] didn't think was right." The victim told the officer that defendant then did the same thing to his son, who was also on the bed.

The victim told the officer that when he went to defendant's house the next time, the drink defendant gave him was three times stronger. He threw up and heard defendant say, "I'm going to jail, I'm going to jail." The victim said he fell to the floor and, about an hour later, saw his father outside and walked home with his father.

The victim also spoke to an investigative specialist. The victim told the investigator that the first time he was at defendant's house, defendant gave him vodka mixed with cranberry juice. He told the investigator defendant had him on the bed on his hands and knees and stuck his finger in the victim's rectum and sucked on his penis. He told him defendant also had his son suck on the victim's penis and lick his "butt" while defendant watched, all three of them naked at the time.

The victim told the investigator that the next time he went to defendant's house, to watch a movie with his son, defendant mixed him a drink of vodka and cranberry juice in the kitchen and told him he was going to teach him twenty things that would make him feel good. Defendant then told him to take off his underwear. The victim did so and returned to the kitchen where he and defendant both drank the drinks defendant mixed. He told the investigator defendant came over to him, unzipped his pants, and sucked on his penis. The victim then went to the bathroom and threw up. The victim told the investigator that, before his father came to get him, defendant gave him a cough drop to hide the smell of alcohol on his breath.

When defendant's son talked to the investigator, he said that his best friend, the victim, drank some Kool–Aid at his house and got sick. He said defendant told him the victim got food poisoning. Defendant's son denied showering with his dad and the victim and said defendant and the victim took separate showers. During the interview, he also told the investigator that he, defendant, and the victim had a secret but would not reveal it. When asked again what the victim was drinking, he said defendant had given the victim some cranberry juice that accidentally had vodka in it.

When an officer contacted defendant at his home, defendant confirmed the victim had been at his house on those two days. When confronted with allegations that he had provided alcohol to the victim and had touched him sexually, defendant denied the allegations. Defendant said he had left his own vodka and cranberry juice drink in the kitchen and, when he was not looking, the victim drank almost all of it and threw up in the bathroom. Defendant also denied showering with his son and the victim. He told the officer he did not call the victim's parents when the victim got sick from the drink because he was embarrassed.

Defendant pleaded guilty to sexual assault on a child by one in a position of trust in exchange for dismissal of all other charges. The district court sentenced defendant to an indeterminate term of four years to life in the Department of Corrections.

At a hearing on the SVP determination, defendant argued he should not be classified an SVP under section 18–3–414.5, C.R.S.

2009. He contended that the Sexual Offender Risk Scale (SORS) under which he was evaluated and scored did not meet the statutory criteria for an SVP designation. Specifically, he argued that the score on the SORS evaluation for likelihood to complete treatment or be arrested for a violent crime does not satisfy the statutory requirement that the defendant is likely to commit an offense as set forth in section 18–3–414.5(1)(a)(IV), C.R.S.2009. He also contended that the evidence presented through the SORS evaluation was insufficient to establish two of the criteria for an SVP designation: that he promoted the relationship with the victim primarily for sexual victimization, as required by section 18–3–414.5(1)(a)(III), C.R.S.2009, and that he is likely to commit another of the listed sex offenses under circumstances in which the victim is a stranger or person with whom he establishes or promotes a relationship primarily for sexual victimization, as required by section 18–3–414.5(1)(a)(IV). The district court rejected these contentions and issued a written order with detailed findings of fact, designating defendant an SVP. Defendant appeals that order.

## II.  Section 18–3–414.5

Section 18–3–414.5(2), C.R.S.2009, provides that, when a defendant is convicted of sexual assault on a child by one in a position of trust or other listed sexual offenses, the probation department shall complete the SVP risk assessment (subject to exceptions that do not apply in this case). Based on the results of the assessment, the court shall make specific findings of fact and enter an order concerning whether the defendant is an SVP. *Id.*

As defined by section 18–3–414.5(1)(a), C.R.S.2009, an SVP is an offender

(I) Who is eighteen years of age or older as of the date the offense is committed . . .;

(II) Who has been convicted . . . of one of the following offenses, or of an attempt, solicitation, or conspiracy to commit one of the following offenses . . .:

(A) Sexual assault . . . or sexual assault in the first degree . . .;

(B) Sexual assault in the second degree . . .;

(C) Unlawful sexual contact . . . or sexual assault in the third degree . . .;

(D) Sexual assault on a child . . .; or

(E) Sexual assault on a child by one in a position of trust . . .;

(III) Whose victim was a stranger to the offender or a person with whom the offender established or promoted a relationship primarily for the purpose of sexual victimization; and

(IV) Who, based upon the results of a risk assessment screening instrument . . . is likely to subsequently commit one or more of the offenses specified in subparagraph (II) of this paragraph (a) under the circumstances described in subparagraph (III) of this paragraph (a).

## III.  SORS Meets the Requirements of Section 18–3–414.5

■ Defendant contends that the SORS does not meet the statutory requirement for a "risk assessment screening instrument" under section 18–3–414.5(1)(a)(IV). Specifically, he contends that the SORS does not determine whether a defendant is likely to reoffend by committing any of the specifically enumerated offenses under the specified circumstances, but only determines whether the defendant is likely to succeed in treatment and supervision. We disagree.

■ When interpreting a statute, our primary duty is to give effect to the intent of the legislature, looking first to the plain language of the statute. *See People v. Tixier*, 207 P.3d 844, 847 (Colo.App.2008); *see also People v. Banks*, 9 P.3d 1125, 1128 (Colo. 2000) (plainness or ambiguity of statutory language is determined by reference to language itself, specific context in which it is used, and broader context of statute as a whole). We read the statute as a whole to give consistent, harmonious, and sensible effect to all of its parts, presuming that the legislature intended the statute as a whole to be effective. *Tixier*, 207 P.3d at 847. Further, we avoid statutory constructions that are at odds with the legislative scheme. *Id.*

The General Assembly recognized the necessity of, among other things, providing for

the comprehensive evaluation of sex offenders subject to the supervision of the criminal justice system and created a program that standardizes such evaluation. § 16–11.7–101, C.R.S.2009. As part of that program, the General Assembly created the Sex Offender Management Board (SOMB). § 16–11.7–103(1), C.R.S.2009. The SOMB, among other things, is required to "consult on, approve, and revise as necessary" the risk assessment screening instrument developed by the division of criminal justice to "assist the sentencing court in determining the likelihood that an offender would commit one or more of the offenses specified in section 18–3–414.5(1)(a)(II), C.R.S. [2009], under the circumstances described in section 18–3–414.5(1)(a)(III), C.R.S. [2009]." § 16–11.7–103(4)(c.5), C.R.S.2009. In carrying out its duty related to the assessment screening instrument, the SOMB must consider "sex offender risk assessment research." *Id.*

With these directives, the SOMB assisted the division of criminal justice in developing the Sexually Violent Predator Assessment Screening Instrument that includes the SORS. Among the research specifically considered by the SOMB, and discussed in the SOMB *Handbook: Sexually Violent Predator Assessment Screening Instrument* (handbook) that is referenced in the SORS, is that which demonstrates the appropriateness of using failure to succeed in treatment and supervision as a predictor of recidivism by sex offenders. *See Handbook: Sexually Violent Predator Assessment Screening Instrument* 45, 52–53 (Jan. 2008), *available at* http://dcj.state.co.us/ors/pdf/docs/FINAL–1–30–2008–SVP% 20Handbook.pdf.

The handbook discusses the research related to risk assessment of sex offenders; the accuracy of the SORS and the tendency for "sexual crimes," as compared to "violent crimes," to be underreported or not result in arrest; and it describes the risk of arrest for violent crimes as a "reasonable proxy" in measuring recidivism of sex offenders. *Id.* at 59–60, 62. The handbook also discusses the development and reliability of the SORS checklist. *Id.* at 41, 51–52.

Mindful of these considerations and the legislative scheme, we conclude that the SOMB satisfied the objectives and criteria set forth in section 16–11.7–103(4)(c.5) for developing the assessment screening instrument. *See Tixier,* 207 P.3d at 847. Thus, we reject defendant's contention that the SORS fails to assess the likelihood to reoffend as required by section 18–3–414.5(1)(a)(IV).

## IV. The Evidence Supports Defendant's SVP Designation

■ Defendant also contends the evidence does not support his designation as an SVP. Again, we disagree.

■ When reviewing mixed questions of law and fact, such as an SVP designation, we defer to the trial court's factual findings, but we review de novo its conclusions of law. *People v. Cook,* 197 P.3d 269, 280 (Colo.App. 2008). Absent clear error, we will not disturb a district court's findings of fact in an SVP determination. *See Tixier,* 207 P.3d at 849 (under clear error standard, findings of historical fact will only be overturned if they are not supported by competent evidence).

■ Section 18–3–414.5(2) requires trial courts to make specific findings of fact regarding whether a defendant is an SVP. The statute also requires that the probation department coordinate with a psychological evaluator to complete an SVP risk assessment and that the judicial findings be based on the results of that assessment. § 18–3–414.5(2); *see People v. Tuffo,* 209 P.3d 1226, 1231 (Colo.App.2009).

■ The SVP statute is protective, not punitive, and the facts underlying an SVP determination need not be proved to a jury beyond a reasonable doubt. *Tuffo,* 209 P.3d at 1231; *People v. Rowland,* 207 P.3d 890, 892–95 (Colo.App.2009). Courts may rely on uncontroverted facts in a presentence report and, even when a defendant challenges facts in the report, the prosecutor is not required to prove those facts with the quality of evidence required at a trial on the criminal charges themselves. *Tuffo,* 209 P.3d at 1231; *People v. Buerge,* 240 P.3d 363, 369 (Colo. App.2009) (a trial court may make its SVP findings based solely on the presentence investigation report and the assessment screening instrument). However, the limits

of due process require that an SVP designation, as with other sentencing determinations, be based on " 'reliable evidence, not speculation or unfounded allegations.' " *Tuffo,* 209 P.3d at 1231 (quoting *United States v. England,* 555 F.3d 616, 622 (7th Cir.2009)). Proof by a preponderance of the evidence of facts relied upon in sentencing determinations generally satisfies due process considerations. *Tuffo,* 209 P.3d at 1231.

Here, the prosecution presented defendant's presentence report and SORS evaluation as support for his designation as an SVP. At two hearings on the matter, defendant contested the scores he received, the subjective nature of the scoring, and the use of an SOMB checklist in the evaluation. Specifically, he contested the determinations based on the SORS that he met the third criterion, that he promoted the relationship for sexual victimization, and the fourth criterion, that he is likely to reoffend under similar circumstances, as necessary for an SVP designation. *See* § 18–3–414.5(1)(a)(IV). He argued that his responses to the questions in the evaluation, including the absence of any self-reported deviant sexual behaviors, did not support the scores he received.

However, the absence of self-reported deviancy and denial of certain behaviors were countered by other determinations made by the trained evaluator. The evaluation presented to the district court included the evaluator's references to defendant's denial of the crime committed and suggestion that the victim was a willing participant; determinations that defendant demonstrates an "overly positive self-presentation," a "high likelihood of invalid responses," and "resistance to admitting personal shortcomings"; and midrange scores of defendant for the "inability to respond truthfully," dishonesty, lack of motivation for treatment, and classification as a "manipulator."

After receiving proposed findings of fact from both parties, the district court adopted the evaluator's findings and found that defendant met the criteria for an SVP. Specifically, as pertinent here, the court found that, as required by section 18–3–414.5(1)(a)(III), defendant promoted an existing relationship primarily for the purpose of sexual victimization. In that regard the court found, with record support:

> Defendant [p]romoted this relationship by taking steps to change the focus of the relationship to facilitate the commission of a sexual assault specifically by drugging the victim. The Defendant encouraged the relationship with the victim by inviting the victim over to his house to play with the defendant's step child on several occasions. The Defendant requested that the victim have [a] sleep over at his residence on one occasion. The Defendant provided alcohol to the minor victim on two of those occasions. The victim was sexually assaulted by the Defendant on both occasions after the Defendant had provided alcohol to the victim.
>
> The Defendant engaged in contact with the victim that was progressively more sexually intrusive. The Defendant's conduct progress[ed] from sexual touching to fellatio to digital penetration of the victim's anus.

Based on defendant's scores on the SORS evaluation and record support of defendant's history with alcohol, the court also found that the sexual offense here took place when defendant was drinking; that the public is at risk when defendant drinks; and that defendant is incapable of abstaining from alcohol. Thus, the court further found that defendant is "likely to commit one or more of the offenses specified in" section 18–3–414.5(1)(a)(II), "under the circumstances described in" section 18–3–414.5(1)(a)(III).

Moreover, in reaching its conclusion that defendant is an SVP, the court recognized the discretion of the evaluator in scoring, but deferred to the evaluator's expertise. It is within the court's prerogative to choose between inconsistent evaluations, and we perceive no clear error where the court deferred to the expertise of the sole evaluator and accepted the scores set forth in the evaluation. *See Tuffo,* 209 P.3d at 1231; *Tixier,* 207 P.3d at 849. Further, the trial court's findings based on the risk assessment of defendant and following the court's independent review of the file in this case (including the entire presentence report and affidavit in support of defendant's arrest) were adequate.

*See Tuffo,* 209 P.3d at 1231; *Tixier,* 207 P.3d at 849.

The order is affirmed.

Judge GRAHAM and Judge MILLER concur.